IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| F.B. and M.B., individually and as natural guardians and next friends of their children, L.B., I.B., E.B. and El.B.; <br><br> L.B., individually, a minor; <br><br> I.B., individually; <br><br> E.B., individually; <br><br> El.B., individually, <br><br>     Plaintiffs, <br><br> v. <br><br> Archdiocese of St. Louis, Missouri; <br><br> Mitchell T. Rozanski, in his official capacity as Archbishop of the Archdiocese of St. Louis; <br><br> Our Lady of Lourdes Parish and School, <br><br>     Defendants. | Civil Action No. <br><br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

**I.   INTRODUCTION**

Plaintiffs F.B. and M.B.,, individually and as natural guardians and next friends of L.B., I.B., E.B. and El.B., and L.B., I.B., E.B. and El.B., individually, bring this action by and through their undersigned counsel, Judith A. Gran (pro hac vice motion pending) of Reisman Carolla Gran & Zuba, LLP in Haddonfield, New Jersey, and local counsel Kenneth M. Chackes, against the Archdiocese of St. Louis, Missouri ("Archdiocese"), Archbishop Mitchell T. Rozanski

1

("Archbishop") and Our Lady of Lourdes Parish and School in Washington, Missouri ("Lourdes")  asserting causes of action for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Plaintiffs assert that the defendants violated their rights under Section 504 by discriminating and retaliating against them. They allege and aver as follows:

**II.     PARTIES.**

    1.   F.B. is a resident of Washington, Franklin County, Missouri.

    2.   M.B. is a resident of Washington, Franklin County, Missouri.

    3.   L.B. is the minor child of F.B. and M.B.

    4.   I.B. is the minor child of F.B. and M.B.

    5.   E.B. is the minor child of F.B. and M.B.

    6.   El.B. is the adult child of F.B. and M.B.

    7.   Defendant the Archdiocese of St. Louis ("Archdiocese") is an ecclesiastical province of the Roman Catholic Church, administered by the Archbishop of St. Louis. It is a nonprofit corporation duly organized under the laws of the State of Missouri. Its jurisdiction includes the City of St. Louis and the Missouri counties of Franklin, Jefferson, Lincoln, Perry, Saint Charles, Saint Francois, Ste. Genevieve, St. Louis, Warren, and Washington. The offices of the Archdiocese are at 20 Archbishop May Drive, St. Louis, MO 63119.

    8.   Defendant Archbishop Mitchell T. Rozanski (hereinafter "Archbishop") is a citizen of the State of Missouri and is the current Archbishop in charge of the Archdiocese of St. Louis  which is located in St. Louis, Missouri, and encompasses much of Eastern Missouri. He is currently responsible for overseeing the day to day operations of the Archdiocese. Defendant

2

Archbishop Rozanski is sued herein in his official capacity as Archbishop of the Archdiocese of St Louis.

9. The Archdiocese is responsible for governing the parishes and schools that are located within its borders.

10. The Archdiocese is a recipient of federal financial assistance.

11. Defendant Our Lady of Lourdes Parish and School ("Lourdes") is one of the parishes of which the Archdiocese is composed. It is a nonprofit corporation duly organized under the laws of the State of Missouri. The offices of the Parish are at 1014 Madison Avenue, Washington, MO 63090. The principal place of business of the Lourdes School are at 950 Madison Avenue, Washington, MO 63090.

12. Lourdes is a recipient of federal financial assistance.

### III. JURISDICTION AND VENUE

13. This court has original jurisdiction of a civil action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504") pursuant to 28 U.S.C. § 1331.

14. This court has jurisdiction to render the requested declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) because the Defendant Archdiocese resides in the City and County of St. Louis, Missouri.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) because Defendant Lourdes resides in Franklin County, Missouri.

17. Divisional venue is proper in this Division of the Eastern District of Missouri pursuant to Local Rule 3.1.

**IV.    FACTS**

    **A.    Defendants' System of Catholic Elementary and Secondary Education and Their Provision of Special Education Services.**

18.    The Archdiocese is responsible for oversight of the Catholic schools within the archdiocese. It exercises this responsibility through its Office of Catholic Education and Formation. Education in the schools of the Archdiocese is overseen by a Superintendent for Elementary Education, a Superintendent for Secondary Education, and a network of regional superintendents.

19.    The Archdiocese has a Department of Special Education and has issued guidance in how to support students with disabilities using a teacher-consultant model.

20.    The schools of the Archdiocese are expected to adhere to the National Standards and Benchmarks for Effective Catholic Elementary and Secondary Schools in governance and leadership, academic excellence, and accountability.

21.    The Archbishop of the Archdiocese is responsible for visiting the Catholic schools of the Archdiocese, for recommending curriculum, and for issuing directives for the general regulation of Catholic schools of the Archdiocese. *See Code of Canon Law,* Can. 806 §1.

22.    The Archdiocese of St. Louis offers elementary special education services to children in its schools who need such services. Those services include interventions to improve a student's organizational skills, homework completion and school conduct, as well as to access to an appropriately challenging curriculum that provides opportunity for success.

23.    Our Lady of Lourdes Parish and School follows a curriculum recommended by the Archdiocese of St. Louis.

24.    Lourdes has made a commitment to work diligently to individualize instruction and cater to students' needs, interests, and learning styles. It advises parents that its teachers

4

collaborate daily to learn and grow professionally for the benefit of the students. It characterizes itself as a professional learning community in which all teachers work together for the success of each and every child.

25. Lourdes staff include a full-time Resource Teacher who provides support for students who are below, or above, grade level expectations.

### B. Defendants' Discriminatory Conduct Toward L.B. and Its Retaliatory Actions Toward L.B. and Her Parents and Siblings.

26. L.B. entered Our Lady of Lourdes School during the second half of the 2015-16 school year, when she was in fourth grade.

27. In December, 2015, M.B. and F.B. obtained a cognitive and academic evaluation of L.B. from the St. Louis Learning Disabilities Association, Inc. She was ten years old at the time and midway through fifth grade. L.B. had a history of reduced vision. She was diagnosed with ADHD in third grade and took medications for that condition. She experienced adverse side effects from the medications. She struggled with academic work in school, with fine motor skills, and with organizational skills and routines of daily living in school and at home. Even with medication, she struggled to complete homework and typically spent three to four hours every evening, with her mother helping her.

28. The evaluation revealed that overall, L.B.'s cognitive abilities were in the high average range. However, her abilities were very unevenly developed. Her Index scores ranged from the lower part of the average range in measures of auditory working memory to the superior range on the nonverbal index. The certified school psychologist who tested L.B. considered that the latter was the best measure of her abilities. Her academic achievement was highly varied, with particular difficulty in mathematics.

5

29. The psychologist concluded that L.B.'s academic difficulties were due to processing deficits in aspects of working memory that made it more difficult to "juggle" multiple parts of tasks. Her struggles with working memory were exacerbated by struggles with executive functioning related to her ADHD. These weaknesses interacted and exacerbated one another so that in combination, their academic impact was more pronounced than either would be in and of itself.

30. This pattern was apparent in L.B.'s reading. She had learned "pieces" of reading skills but struggled to hold them in memory and integrate them for effective reading. She struggled to efficiently process the amount of information in a reading passage.

31. In writing, L.B. struggled to present ideas in a sequenced way and tended to move from one idea to a second idea randomly. As a result, her ability to develop a theme was within the lower part of the average range rather than what would be expected given her cognitive strengths. L.B.'s deficits in fine motor skills also affected her ability to write fluently. L.B.'s deficits in working memory were most apparent in math.

32. The evaluation contained a number of recommendations to accommodate L.B.'s deficits in memory, attention and fine motor skills.

33. The Parents provided the evaluation to Lourdes, and in a meeting with the Principal and a special education teacher, Lourdes accepted the evaluation and agreed to provide services and accommodations to L.B. Lourdes provides such services and accommodations to students with disabilities through a Learning Plan.

34. In January, 2016, after L.B.'s parents provided the evaluation to the School, the School developed a list of classroom adjustments it would provide to L.B. from a standard checklist it used to identify accommodations for students with disabilities. The accommodations

6

included the provision of study guides and teacher notes, supervision in writing down homework assignments and an extra set of books at home. It also included preteaching new reading vocabulary, providing questions prior to reading, sending passages home, allowing computation aides and a calculator in math, and many other in-class accommodations.

35. After L.B.'s accommodations were agreed to, her experience in school improved significantly. Her parents were happy with the improvement, and wrote to Lourdes staff expressing their gratitude.

36. However, after the list of accommodations was developed, the school principal left and was replaced by a new principal who refused to require the teaching staff to provide the accommodations.

37. In January, 2017, the new principal informed L.B.'s parents that the list was "outdated" and no longer would be adhered to.

38. However, the January, 2016 list of accommodations was the only such list the parents ever received.

39. The fall of the 2016-17 school year did not go well for L.B. Her parents learned that the agreed-upon accommodations were not being provided.

40. L.B. also experienced emotional difficulties during the fall semester of that year, due in part to bullying and cyber-bullying connected to the school, and in part to the death of one of her friends in the Las Vegas mass shooting. L.B. was falsely accused of cyber-bullying, which was extremely stressful.

41. L.B. began to receive failing grades in school and failed to turn in assignments. Her parents sent numerous written communications to L.B.'s teachers, the principal of Lourdes and the pastor of Our Lady of Lourdes Parish, Father Jim Theby, in an effort to resolve the

7

problems. In particular, the failure to turn in assignments could have been resolved by implementing the accommodations in L.B. Learning Plan.

42. When Lourdes refused to provide teacher notes, M.B. offered to provide paper and toner to make copies of the overhead transparencies that teacher used during their lectures, and even offered to come to the school and make copies herself, but the School refused.

43. L.B.'s difficulties were compounded by Lourdes' staff's failure to post accurate information about homework assignments in the school's online student information system, School Speak. Because of L.B.'s difficulties in working memory and copying homework assignments, she was especially dependent on the School Speak system. Her mother tried to help her by checking assignments in School Speak, but often, the assignments were not posted there.

44. L.B.'s teacher stated to M.B. that L.B.'s difficulties in school were not due to her disability: "I don't think this is a memory problem…I think this is a lazy kid problem."

45. During the 2017-18 school year, L.B. would spend most afternoons in the hallway, making up homework and missing that day's classwork. The principal and her teacher made disparaging remarks to her when they walked by her in the hall, such as "Again, [L.B.]?" or "Why can't you just do your work like everyone else?"

46. L.B. also spent her time sitting on the floor in the principal's office during recess, although a table and chairs was available in the office.

47. In addition, the principal threatened to arrest L.B. for cyber-bullying.

48. M.B. made many attempts to discuss L.B.'s learning needs and the threat to arrest L.B. with the principal of Lourdes, without success. Finally, in November, 2017, she asked Father Theby, for help getting a meeting with the principal because her phone calls were going unanswered and stopping by the principal's office did not result in a meeting.

49. On November 20, the principal agreed to meet, and the parties corresponded about dates, but without agreement on a time to meet.

50. On December 6, 2017, after three unsuccessful attempts to schedule a meeting, M.B. wrote to the principal, expressing her concerns about L.B.'s Learning Plan. She wrote that "The learning plan that was established for [L.B.] in the past was forgotten about this year, and we would like to discuss what has to be done in order to help Lilly succeed, and reimplement the plan." M.B. added that "[w]e were not aware that Lilly's teachers had not known about [L.B.]'s learning disabilities until the most recent parent-teacher conferences. … In the past School years, the teachers were well informed of her capabilities. This year, no one was informed, until I informed them."

51. The principal agreed to meet the next day, and M.B. and F.B. met with the principal as planned. The principal was completely unaware of L.B.'s Learning Plan and did not even know where to begin to look for it. She said she would locate it, review it, and then get back to them with a plan to move forward.

52. M.B. asked again that L.B. be provided with copies of class notes that already were available and shared widely with all other students at Our Lady of Lourdes who were absent or injured, or when class time was insufficient to write down the material. L.B. had never brought home notes. M.B. also asked for staff to remind L.B. to turn in her work, and for a calculator for math. Communications from L.B.'s teacher showed that the simple step of reminding her to turn her homework in was quite successful.

53. The principal took no action after this meeting.

54. On December 13, M.B. wrote to Father Theby about the principal's failure to follow through on the commitments made during their meeting, and the impact on L.B., who had begun to self-harm.

55. In late January, M.B.'s School Speak user ID was changed so that she no longer could receive messages from School Speak.

56. In early 2018, someone connected with Lourdes reported misleading information to the Missouri Department of Social Services ("DSS"), claiming suspected abuse or neglect of the children of F.B. and M.B. DSS dismissed the report as unfounded, and investigator reported that it may have been submitted in retaliation against the parents for their advocacy for their children at Lourdes. As a result of the false report, the parents informed Lourdes staff that the school's communications with them needed to be in writing.

57. On February 3, 2018, M.B. wrote to Father Theby, asking for help, discussing the DSS report and putting him on notice that the parents were engaged in protected activity. .

58. The principal wrote to the parents on February 5, falsely claiming that she had reviewed L.B.'s Learning Plan with M.B. and F.B. at the meeting on December 5. M.B. responded, noting that the principal had never reviewed a Learning Plan with her.

59. Finally, on February 9, 2018, the parents met with the school principal and Father Theby to discuss L.B.'s lack of progress and develop a plan to help her succeed in school. Before the meeting, the pastor of Lourdes wrote to M.B., stating that Lourdes staff would refuse to discuss any topic in the meeting other than L.B.'s progress in school. The parents accepted this limitation.

60. In the meeting, one of L.B.'s teachers repeated the accusation that she was merely lazy and did not need accommodations. The pastor of Lourdes commented that he was

"not calling [L.B.] dumb," but was unsure how Lourdes could help her. The participants discussed the accommodations on the checklist that Lourdes had agreed to provide, and the teachers agreed to provide the accommodations and left the meeting.

61. The meeting continued with only the parents, the principal and the pastor in attendance. The pastor was visibly upset with the parents. He stated that he had been reading M.B.'s email correspondence with Lourdes staff, and he did not think Lourdes was a good fit for any of the family's children.

62. F.B. defended M.B.'s correspondence as appropriate advocacy for their children and noted that the only change since the list of accommodations was developed was the change in principal. In response, the principal smiled and said she was not going anywhere. F.B. stated that "we will see about that."

63. At that point, Father Theby accused F.B. of threatening the principal and informed F.B. and M.B. that their family no longer was welcome at the Lourdes School and that they should leave immediately.

64. On February 10, 2018, M.B. wrote to Father Theby requesting that he state the reasons for their children's expulsion in writing. Father Theby denied this request.

65. Also on February 10, 2018, the principal declined to give M.B. her children's school records.

66. None of the family's children returned to Lourdes after the expulsion. They were homeschooled for the rest of the school year and lost a year of school.

67. The children told some of their friends that they had been expelled, and when parents began asking Father Theby what had happened, he replied falsely that the parents had

11

gotten in his face, cursed at him and threatened him. A false and defamatory report circulated that F.B. had physically assaulted Father Theby.

68.　The impact of the expulsion on F.B.'s and M.B.'s children was devastating. All four suffered emotional harm as a direct result of Lourdes' retaliation against them.

69.　For a time after the expulsion, L.B. rarely left her room. She felt that the expulsion was all her fault and that her failure to do well in school was the cause. She doubted her own ability and intelligence and began to insist that she must actually have an intellectual disability and that her mother was hiding the nature of her disability.

70.　I.B. was to have graduated from Lourdes that year. As a result of the expulsion, she was not allowed to participate in graduation activities, field trips and other activities such as the school play. She tried to stay involved with her friends as much as possible and continued to attend Lourdes basketball games. However, she felt intimidated at one of the games by a priest and the principal who had participated in her expulsion. She attended the performance of the school play, but cried throughout the play because of all that she had lost. Some of her friends no longer would associate with her. One friend told her that his parents would not allow her to attend his graduation party.

71.　Even before the expulsion, I.B. was singled out by Lourdes staff because of her sister; for example, she was held after class to answer questions about L.B.'s problems with her schoolwork.

72.　E.B., who was only eight years old at the time, lost all her friends and was sad most of the time because she missed her friends, her teacher and going to school. Like L.B., she had little desire to leave the house.

12

73. E.B. still attends a Catholic school, and for this reason plaintiffs seek injunctive relief against the defendant Archdiocese on her behalf to prevent further harm in the future.

74. El.B. attended a regional high school in the Archdiocese at the time of the expulsion, and had to answer to her friends about why her sisters were expelled. She continued to encounter Father Theby at the regional high school and felt intimidated by those encounters.

75. F.B. and M.B. were harmed by the expulsion. They received anonymous letters telling them to move out of town. They were ostracized by some of their neighbors in a community in which a large proportion of the families are Catholic and have children who attend Lourdes.

76. M.B. had to cut back on her work hours because she was homeschooling three of her children.

77. As a result of the emotional distress caused by the expulsion, the false rumors and the defamatory statements discussed above, F.B. experienced an exacerbation of a medical condition that causes severe pain. He received counselling to address the emotional distress and underwent surgery to deal with the pain.

78. As a private educational entity that offers special educational services, the Archdiocese and Lourdes are required to comply with certain requirements of Section 504 in addition to the requirement to provide reasonable accommodations. Those requirements include the following obligations:

(a) The obligation to "conduct an evaluation … of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement," 34 C.F.R. §104.35(a);

13

  (b) The obligation to "establish standards and procedures for the evaluation and placement of persons who, because of handicap, need or are believed to need special education or related services";

  (c) The obligation to "establish and implement" for students with disabilities "a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

79. Lourdes never conducted an evaluation of L.B. Nor were L.B.'s parents ever provided with procedural safeguards, including notice and an opportunity to be heard, and L.B. and her sisters were summarily expelled without notice or due process.

80. On July 13, 2018, F.B. and M.B., through counsel, submitted a formal complaint and request for hearing to the Archdiocesan Archbishop, Robert J. Carlson; to Father Jim Theby, the Pastor of Our Lady of Lourdes Parish; and the Principal of Our Lady of Lourdes School, Tammi Rohman, setting forth the facts and violations of law discussed above.

81. The only response the family received to this complaint was a statement that the defendants are unwilling to engage with lawyers and that the decision was final and not subject to review.

**V. CLAIMS.**

### COUNT I
### SECTION 504 OF THE REHABILITATION ACT
### U.S.C. § 794: Archdiocese Defendants

82. Plaintiffs repeat each paragraph above as if set forth at length herein.

14

83. Acting in bad faith and with gross misjudgment and deliberate indifference, the Archdiocese Defendants violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

   a. denying L.B. the opportunity to participate in and benefit from federally assisted regular and special education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);
   b. affording L.B. an opportunity to participate in or benefit from public education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);
   c. providing L.B. with public education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);
   d. limiting L.B.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);
   e. failing to establish standards and procedures for the evaluation and placement of students who, because of their disabilities, need or are believed to need special education services, in violation of 34 C.F.R. § 104.34(b);
   f. failing to provide L.B.'s parents with procedural safeguards, including prior written notice and opportunity for a hearing, in violation of 34 C.F.R. § 104.36.

84. Acting in bad faith and with gross misjudgment and deliberate indifference, the Archdiocese Defendants violated the rights of F.B., M.B., L.B., I.B., E.B. and El.B. secured by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R.§ 104.4 by retaliating against them because of a protected activity, F.B. and M.B.'s advocacy for the accommodations L.B. needed.

85. Defendants had actual notice of the above violations of plaintiffs' rights.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT
## 29  U.S.C.  § 794: Our Lady of Lourdes Parish and School

86. Plaintiffs repeat each paragraph above as if set forth at length herein.

87. Acting in bad faith and with gross misjudgment and deliberate indifference, Our Lady of Lourdes Parish and School violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

    a. denying L.B. the opportunity to participate in and benefit from federally assisted regular and special education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    b. affording L.B. an opportunity to participate in or benefit from public education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

    c. providing L.B. with public education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

    d. providing L.B.. with different or separate aids, benefits, or services, although

    e. limiting L.B.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);

    f. failing to provide L.B.'s parents with procedural safeguards, including prior written notice and opportunity for a hearing, in violation of 34 C.F.R. § 104.36;

88. Acting in bad faith and with gross misjudgment and deliberate indifference, the defendant Our Lady of Lourdes Parish and School violated the rights of F.B., M.B., L.B., I.B., E.B. and El.B. secured by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R.§ 104.4 by retaliating against them because of a protected activity, F.B. and M.B.'s advocacy for the accommodations L.B. needed.

89. Defendant had actual notice of the above violations of plaintiffs' rights.

WHEREFORE, F.B., M.B., L.B., I.B., E.B., El.B. pray this Court for the following:

A. Enjoin any further action that violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.;

B. Declare, adjudge and decree that Defendants violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.;

C. Declare, adjudge and decree that Defendants have retaliated against F.B., M.B., L.B., I.B. E.B. and El.B. for exercising their rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, et seq.

D. Make F.B., M.B., L.B., I.B., E.B. and El.B. whole for the damages suffered by them for defendants' willful violations and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. in an amount adequate to compensate them for their injuries.

E. Award plaintiffs their costs herein, including reasonable attorneys' fees;

F. Award plaintiffs pre-judgment and post-judgment interest; and,

G. Grant such additional relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial under Federal Rule of Civil Procedure 38(b)

Respectfully submitted,

*/s/ Kenneth M. Chackes*
Kenneth M. Chackes, #27534MO
(Local Counsel)
KEN CHACKES, LLC
230 S. Bemiston Ave., Suite 510
St. Louis, Missouri 63105
Phone: (314) 872-8420
Fax: (314) 872-7017
kchackes@chackes.com

Judith A. Gran
PA Attorney ID 40134
(pro hac vice pending)
Reisman Carolla Gran & Zuba, LLP
19 Chestnut Street
Haddonfield, NJ  08033
Telephone: (856)-354-0061
Fax: (856) 873-5640
judith@rcglawoffices.com

ATTORNEYS FOR PLAINTIFFS

17