**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| F.B. and M.B., individually and as natural guardians and next friends of their children, L.B., I.B., E.B. and El.B.; | |
| L.B., individually, a minor; | |
| I.B., individually; | |
| E.B., individually; | |
| El.B., individually, | Civil Action No. 4:22-cv-00152-RWS |
| | Honorable Rodney W. Sipple |
| PETER AND BECKY HANRAHAN. individually and as natural guardians and next friends of their children, P.H. and R.H.; | **JURY TRIAL DEMANDED** |
| P.H., individually, a minor | |
| R.H., individually, a minor, | |
| S.C., individually and as natural guardian and next friend of her child, B.Y., | |
| B.Y., individually, a minor, | |
|    Plaintiffs, | |
|        v. | |
| Archdiocese of St. Louis, Missouri; | |
| Mitchell T. Rozanski, in his official capacity as Archbishop of the Archdiocese of St. Louis; | |
| Our Lady of Lourdes Parish and School, | |
| Ste. Genevieve du Bois Parish and School, | |
| Immaculate Conception Catholic Church and School, Union, | |
|    Defendants. | |

**FIRST AMENDED COMPLAINT**

**I.   INTRODUCTION**

Plaintiffs F.B. and M.B.,, individually and as natural guardians and next friends of L.B.,
I.B., E.B. and El.B.; L.B., I.B., E.B. and El.B., individually; Peter and  Becky Hanrahan,
individually and as natural guardians and next friends of P.H and R.H.; P.H. and R.H.
individually; S.C., individually and as natural guardian and next friend of B.Y., and B.Y.
individually, bring this action by and through their undersigned counsel, Judith A. Gran  of
Reisman Carolla Gran & Zuba, LLP in Haddonfield, New Jersey, and local counsel Kenneth M.
Chackes, against the Archdiocese of St. Louis, Missouri ("Archdiocese"), Archbishop Mitchell
T. Rozanski  ("Archbishop"); Our Lady of Lourdes Parish and School in Washington, Missouri
("Lourdes"); Ste. Genevieve Du Bois Catholic Church  ("Ste.Genevieve") and Immaculate
Conception Catholic Church, Union, asserting causes of action for violations of Section 504 of
the Rehabilitation Act of 1973, 29 U.S.C. § 794("Section 504") and Missouri common law.
Plaintiffs assert that the defendants violated their rights under Section 504 by discriminating and
retaliating against them. They allege and aver as follows:

**II.   PARTIES.**

1.      F.B. is a resident of Washington, Franklin County, Missouri.

2.      M.B. is a resident of Washington, Franklin County, Missouri.

3.      L.B. is the minor child of  F.B. and M.B.

4.      I.B. is the minor child of F.B. and M.B.

5.      E.B. is the minor child of F.B. and M.B.

6.      El.B. is the adult child of F.B. and M.B.

7.      Peter Hanrahan is a resident of St. Louis County, Missouri.

8.      Becky Hanrahan is a resident of St. Louis County, Missouri.

9.      P.H. is the minor child of Peter and Becky Hanrahan.

10.     R.H. is the minor child of Peter and Becky Hanrahan.

11.     S.C. is a resident of Franklin County, Missouri.

12.     B.Y. is the minor child of S.C.

13.     Defendant the Archdiocese of St. Louis ("Archdiocese") is an ecclesiastical province of the Roman Catholic Church, administered by the Archbishop of St. Louis. It is a nonprofit corporation duly organized under the laws of the State of Missouri. Its jurisdiction includes the City of St. Louis and the Missouri counties of Franklin, Jefferson, Lincoln, Perry, Saint Charles, Saint Francois, Ste. Genevieve, St. Louis, Warren, and Washington. The offices of the Archdiocese are at 20 Archbishop May Drive, St. Louis, MO 63119.

14.     Defendant Archbishop Mitchell T. Rozanski (hereinafter "Archbishop") is a citizen of the State of Missouri and is the current Archbishop in charge of the Archdiocese of St. Louis  which is located in St. Louis, Missouri, and encompasses much of Eastern Missouri. He is currently responsible for overseeing the day to day operations of the Archdiocese. Defendant Archbishop Rozanski is sued herein in his official capacity as Archbishop of the Archdiocese of St Louis.

15.     The Archdiocese is responsible for governing the parishes and schools that are located within its borders.

16.     The Archdiocese is a recipient of federal financial assistance.

17.     Defendant Our Lady of Lourdes Parish and School ("Lourdes") is one of the parishes of which the Archdiocese is composed. It is a nonprofit corporation duly organized under the laws of the State of Missouri. The offices of the Parish are at 1014 Madison Avenue,

Washington, MO 63090. The principal place of business of the Lourdes School are at 950 Madison Avenue, Washington, MO 63090.

18.     Lourdes is a recipient of federal financial assistance.

19.     Defendant Ste. Genevieve Du Bois Catholic Church ("Ste. Genevieve") is one of the parishes of which the Archdiocese is composed. It is a nonprofit corporation duly organized under the laws of the State of Missouri. The offices and principal place of business of Ste. Genevieve are at 1575 N. Woodlawn Avenue, St. Louis, MO 63122.

20.     Ste. Genevieve School is fully accredited in the Archdiocese of St. Louis.

21.     Ste. Genevieve is a recipient of federal financial assistance.

22.     Defendant Immaculate Conception Catholic Church, Union ("Immaculate Conception") is one of the parishes of which the Archdiocese is composed. It is a nonprofit corporation duly organized under the laws of the State of Missouri. The offices and principal place of business of the Parish and its School are at 100 N Washington Ave., Union, MO 63084. Immaculate Conception School is located at 6 W. State St., Union, MO 63084.

23.     Immaculate Conception is fully accredited in the Archdiocese of St. Louis.

24.     Immaculate Conception is a recipient of federal financial assistance.

III.    JURISDICTION AND VENUE

25.     This court has original jurisdiction of a civil action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504") pursuant to 28 U.S.C. § 1331.

26.     This court has jurisdiction to render the requested declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

27.     This court has jurisdiction of plaintiffs' claims arising under Missouri state law by virtue of supplemental jurisdiction, 28 U.S.C. § 1367(a), as these claims are so related to the claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) because the Defendant Archdiocese resides in the City and County of St. Louis, Missouri.

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) because Defendant Lourdes and Defendant Immaculate Conception reside in Franklin County, Missouri.

30.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant Ste. Genevieve resides in St. Louis County, Missouri.

31.     Divisional venue is proper in this Division of the Eastern District of Missouri pursuant to Local Rule 3.1.

IV.    FACTS

A.    **Defendants' System of Catholic Elementary and Secondary Education and Their Provision of Special Education Services.**

32.     The Archdiocese is responsible for oversight of the Catholic schools within the archdiocese. It exercises this responsibility through its Office of Catholic Education and Formation. Education in the schools of the Archdiocese is overseen by a Superintendent for Elementary Education, a Superintendent for Secondary Education, and a network of regional superintendents.  The Archdiocese has a Department of Special Education and has issued guidance in how to support students with disabilities using a teacher-consultant model. The schools of the Archdiocese are expected to adhere to the National Standards and Benchmarks for Effective Catholic Elementary and Secondary Schools in governance and leadership, academic excellence, and accountability.

5

33.     The Archbishop of the Archdiocese is responsible for visiting the Catholic schools of the Archdiocese, for recommending curriculum, and for issuing directives for the general regulation of Catholic schools of the Archdiocese. *See Code of Canon Law,* Can. 806 §1.

34.     The Archdiocese of St. Louis offers elementary special education services to children in its schools who need such services. Those services include interventions to improve a student's organizational skills, homework completion and school conduct, as well as to access to an appropriately challenging curriculum that provides opportunity for success.

35.     Our Lady of Lourdes Parish and School follows a curriculum recommended by the Archdiocese of St. Louis.

36.     Lourdes has made a commitment to work diligently to individualize instruction and cater to students' needs, interests, and learning styles. It advises parents that its teachers collaborate daily to learn and grow professionally for the benefit of the students. It characterizes itself as a professional learning community in which all teachers work together for the success of each and every child. Lourdes staff include a full-time Resource Teacher who provides support for students who are below, or above, grade level expectations.

37.     Ste. Genevieve follows a curriculum recommended by the Archdiocese of St. Louis.

38.     Ste. Genevieve has made a commitment to enable its students to receive individual attention, to leverage individualized learning profiles to maximize results for each student.

39.     Ste. Genevieve's staff includes a Learning Consultant who is available to assist children looking for extra help and who tailors his approach to the child's specific needs, offering one-on-one guidance or small group assistance.

40. Immaculate Conception Parish and School follows a curriculum recommended by the Archdiocese of St. Louis.

41. Immaculate Conception School has made a commitment to strive to make sure that all students have the tools and resources to be successful and to work with them and their family to come up with a plan that will fit their needs.

42. Immaculate Conception School staff includes an Academic Support person, who is available to assist children looking for extra help and who tailors her approach to the child's specific needs, offering one-on-one guidance or small group assistance.

A.  **The Discriminatory Conduct of the Archdiocese and Lourdes Defendants Toward L.B. and Its Retaliatory Actions Toward L.B. and Her Parents and Siblings.**

43. L.B. entered Our Lady of Lourdes School during the second half of the 2015-16 school year, when she was in fourth grade.

44. In December, 2015, M.B. and F.B. obtained a cognitive and academic evaluation of L.B. from the St. Louis Learning Disabilities Association, Inc. She was ten years old at the time and midway through fifth grade. L.B. had a history of reduced vision. She was diagnosed with ADHD in third grade and took medications for that condition. She experienced adverse side effects from the medications. She struggled with academic work in school, with fine motor skills, and with organizational skills and routines of daily living in school and at home. Even with medication, she struggled to complete homework and typically spent three to four hours every evening, with her mother helping her.

45. The evaluation revealed that overall, L.B.'s cognitive abilities were in the high average range. However, her abilities were very unevenly developed. Her Index scores ranged from the lower part of the average range in measures of auditory working memory to the superior

range on the nonverbal index. The certified school psychologist who tested L.B. considered that the latter was the best measure of her abilities. Her academic achievement was highly varied, with particular difficulty in mathematics.

46.     The psychologist concluded that L.B.'s academic difficulties were due to processing deficits in aspects of working memory that made it more difficult to "juggle" multiple parts of tasks.  Her struggles with working memory were exacerbated by struggles with executive functioning related to her ADHD.  These weaknesses interacted and exacerbated one another so that in combination, their academic impact was more pronounced than either would be in and of itself.

47.     This pattern was apparent in L.B.'s reading. She had learned "pieces" of reading skills but struggled to hold them in memory and integrate them for effective reading.  She struggled to efficiently process the amount of information in a reading passage.

48.     In writing, L.B. struggled to present ideas in a sequenced way and tended to move from one idea to a second idea randomly. As a result, her ability to develop a theme was within the lower part of the average range rather than what would be expected given her cognitive strengths. L.B.'s deficits in fine motor skills also affected her ability to write fluently. L.B.'s deficits in working memory were most apparent in math.

49.     The evaluation contained a number of recommendations to accommodate L.B.'s deficits in memory, attention and fine motor skills.

50.     The Parents provided the evaluation to Lourdes, and in a meeting with the Principal and a special education teacher, Lourdes accepted the evaluation and agreed to provide services and accommodations to L.B. Lourdes provides such services and accommodations to students with disabilities through a Learning Plan.

51.     In January, 2016, after L.B.'s parents provided the evaluation to the School, the School developed a list of classroom adjustments it would provide to L.B. from a standard checklist it used to identify accommodations for students with disabilities. The accommodations included the provision of study guides and teacher notes, supervision in writing down homework assignments and an extra set of books at home. It also included preteaching new reading vocabulary, providing questions prior to reading, sending passages home, allowing computation aides and a calculator in math, and many other in-class accommodations.

52.     After L.B.'s accommodations were agreed to, her experience in school improved significantly. Her parents were happy with the improvement, and wrote to Lourdes staff expressing their gratitude.

53.     However, after the list of accommodations was developed, the school principal left and was replaced by a new principal who refused to require the teaching staff to provide the accommodations.

54.     In January, 2017, the new principal informed L.B.'s parents that the list was "outdated" and no longer would be adhered to.

55.     However, the January, 2016 list of accommodations was the only such list the parents ever received.

56.     The fall of the 2016-17 school year did not go well for L.B. Her parents learned that the agreed-upon accommodations were not being provided.

57.     L.B. also experienced emotional difficulties during the fall semester of that year, due in part to bullying and cyber-bullying connected to the school, and in part to the death of one of her friends in the Las Vegas mass shooting. L.B. was falsely accused of cyber-bullying, which was extremely stressful.

58.     L.B. began to receive failing grades in school and failed to turn in assignments. Her parents sent numerous written communications to L.B.'s teachers, the principal of Lourdes and the pastor of Our Lady of Lourdes Parish, Father Jim Theby, in an effort to resolve the problems. In particular, the failure to turn in assignments could have been resolved by implementing the accommodations in L.B. Learning Plan.

59.     When Lourdes refused to provide teacher notes, M.B. offered to provide paper and toner to make copies of the overhead transparencies that teacher used during their lectures, and even offered to come to the school and make copies herself, but the School refused.

60.     L.B.'s difficulties were compounded by Lourdes' staff's failure to post accurate information about homework assignments in the school's online student information system, School Speak. Because of L.B.'s difficulties in working memory and copying homework assignments, she was especially dependent on the School Speak system. Her mother tried to help her by checking assignments in School Speak, but often, the assignments were not posted there.

61.     L.B.'s teacher stated to M.B. that L.B.'s difficulties in school were not due to her disability: "I don't think this is a memory problem…I think this is a lazy kid problem."

62.     During the 2017-18 school year, L.B. would spend most afternoons in the hallway, making up homework and missing that day's classwork. The principal and her teacher made disparaging remarks to her when they walked by her in the hall, such as "Again, [L.B.]?" or "Why can't you just do your work like everyone else?"

63.     L.B. also spent her time sitting on the floor in the principal's office during recess, although a table and chairs was available in the office.

64.     In addition, the principal threatened to arrest L.B. for cyber-bullying.

65.     M.B. made many attempts to discuss L.B.'s learning needs and the threat to arrest L.B. with the principal of Lourdes, without success. Finally, in November, 2017, she asked Father Theby, for help getting a meeting with the principal because her phone calls were going unanswered and stopping by the principal's office did not result in a meeting.

66.     On November 20, the principal agreed to meet, and the parties corresponded about dates, but without agreement on a time to meet.

67.     On December 6, 2017, after three unsuccessful attempts to schedule a meeting, M.B. wrote to the principal, expressing her concerns about L.B.'s Learning Plan. She wrote that "The learning plan that was established for [L.B.] in the past was forgotten about this year, and we would like to discuss what has to be done in order to help Lilly succeed, and reimplement the plan." M.B. added that "[w]e were not aware that Lilly's teachers had not known about [L.B.]'s learning disabilities until the most recent parent-teacher conferences. …  In the past School years, the teachers were well informed of her capabilities. This year, no one was informed, until I informed them."

68.     The principal agreed to meet the next day, and M.B. and F.B. met with the principal as planned. The principal was completely unaware of L.B.'s Learning Plan and did not even know where to begin to look for it. She said she would locate it, review it, and then get back to them with a plan to move forward.

69.     M.B. asked again that L.B. be provided with copies of class notes that already were available and shared widely with all other students at Our Lady of Lourdes who were absent or injured, or when class time was insufficient to write down the material. L.B. had never brought home notes. M.B. also asked for staff to remind L.B. to turn in her work, and for a

calculator for math. Communications from L.B.'s teacher showed that the simple step of reminding her to turn her homework in was quite successful.

70.     The principal took no action after this meeting.

71.     On December 13, M.B. wrote to Father Theby about the principal's failure to follow through on the commitments made during their meeting, and the impact on L.B., who had begun to self-harm.

72.     In late January, M.B.'s School Speak user ID was changed so that she no longer could receive  messages from School Speak.

73.     In early 2018, someone connected with Lourdes reported misleading information to the Missouri Department of Social Services ("DSS"), claiming suspected abuse or neglect of the children of F.B. and M.B.  DSS dismissed the report as unfounded, and investigator reported that it may have been submitted in retaliation against the parents for their advocacy for their children at Lourdes. As a result of the false report, the parents informed Lourdes staff that the school's communications with them needed to be in writing.

74.     On February 3, 2018, M.B. wrote to Father Theby, asking for help, discussing the DSS report and putting him on notice that the parents were engaged in protected activity.

75.     The principal wrote to the parents on February 5, falsely claiming that she had reviewed L.B.'s Learning Plan with M.B. and F.B. at the meeting on December 5. M.B. responded, noting that the principal had never reviewed a Learning Plan with her.

76.     Finally, on February 9, 2018, the parents met with the school principal and Father Theby to discuss L.B.'s lack of progress and develop a plan to help her succeed in school. Before the meeting, the pastor of Lourdes wrote to M.B., stating that Lourdes staff would refuse to

discuss any topic in the meeting other than L.B.'s progress in school. The parents accepted this limitation.

77.     In the meeting, one of L.B.'s teachers repeated the accusation that she was merely lazy and did not need accommodations. The pastor of Lourdes commented that he was "not calling [L.B.] dumb," but was unsure how Lourdes could help her. The participants discussed the accommodations on the checklist that Lourdes had agreed to provide, and the teachers agreed to provide the accommodations and left the meeting.

78.     The meeting continued with only the parents, the principal and the pastor in attendance. The pastor was visibly upset with the parents. He stated that he had been reading M.B.'s email correspondence with Lourdes staff, and he did not think Lourdes was a good fit for any of the family's children.

79.     F.B. defended M.B.'s correspondence as appropriate advocacy for their children and noted that the only change since the list of accommodations was developed was the change in principal. In response, the principal smiled and said she was not going anywhere. F.B. stated that "we will see about that."

80.     At that point, Father Theby accused F.B. of threatening the principal and informed F.B. and M.B. that their family no longer was welcome at the Lourdes School and that they should leave immediately.

81.     On February 10, 2018, M.B. wrote to Father Theby requesting that he state the reasons for their children's expulsion in writing. Father Theby denied this request.

82.     Also on February 10, 2018, the principal declined to give M.B. her children's school records.

83.     None of the family's children returned to Lourdes after the expulsion. They were homeschooled for the rest of the school year and lost a year of school.

84.     The children told some of their friends that they had been expelled, and when parents began asking Father Theby what had happened, he replied falsely that the parents had gotten in his face, cursed at him and threatened him. A false and defamatory report circulated that F.B. had physically assaulted Father Theby.

85.     The impact of the expulsion on F.B.'s and M.B.'s children was devastating. All four suffered emotional harm as a direct result of Lourdes' retaliation against them.

86.     For a time after the expulsion, L.B. rarely left her room. She felt that the expulsion was all her fault and that her failure to do well in school was the cause. She doubted her own ability and intelligence and began to insist that she must actually have an intellectual disability and that her mother was hiding the nature of her disability.

87.     I.B. was to have graduated from Lourdes that year. As a result of the expulsion, she was not allowed to participate in graduation activities, field trips and other activities such as the school play. She tried to stay involved with her friends as much as possible and continued to attend Lourdes basketball games. However, she felt intimidated at one of the games by a priest and the principal who had participated in her expulsion. She attended the performance of the school play, but cried throughout the play because of all that she had lost. Some of her friends no longer would associate with her. One friend told her that his parents would not allow her to attend his graduation party.

88.     Even before the expulsion, I.B. was singled out by Lourdes staff because of her sister; for example, she was held after class to answer questions about L.B.'s problems with her schoolwork.

89.     E.B., who was only eight years old at the time, lost all her friends and was sad most of the time because she missed her friends, her teacher and going to school. Like L.B., she had little desire to leave the house.

90.     E.B. still attends a Catholic school, and for this reason plaintiffs seek injunctive relief against the defendant Archdiocese on her behalf to prevent further harm in the future.

91.     El.B. attended a regional high school in the Archdiocese at the time of the expulsion, and had to answer to her friends about why her sisters were expelled. She continued to encounter Father Theby at the regional high school and felt intimidated by those encounters.

92.     F.B. and M.B. were harmed by the expulsion. They received anonymous letters telling them to move out of town. They were ostracized by some of their neighbors in a community in which a large proportion of the families are Catholic and have children who attend Lourdes.

93.     M.B. had to cut back on her work hours because she was homeschooling three of her children.

94.     As a result of the emotional distress caused by the expulsion, the false rumors and the defamatory statements discussed above, F.B. experienced an exacerbation of a medical condition that causes severe pain. He received counselling to address the emotional distress and underwent surgery to deal with the pain.

**B.      The Discriminatory Conduct of the Archdiocese and Ste. Genevieve Defendants Toward P.H. and Its Retaliatory Actions Toward P.H. and Her Parents and Siblings.**

95.     P.H. started third grade at Ste. Genevieve du Bois School in spring of 2018 and continued to attend school there for the rest of third grade, for all of fourth and fifth grade, and for the beginning of sixth grade before she was expelled.

96.     Becky and Peter Hanrahan wanted to transition P.H. to a school that went through eighth grade because they planned for her to go to an all-girls Catholic high school, but her former school only went to sixth grade and there are limited all-girl Catholic schools beginning in seventh grade.  The Hanrahans and P.H. toured Ste. Genevieve du Bois School in February 2018 with the intention to switch schools the following school year but were so impressed they enrolled P.H. that March.

97.     P.H. was a sixth grade student of the Ste. Genevieve School during the 2021-22 school year.  As a result of her treatment at Ste. Genevieve during sixth grade and her expulsion, P.H. no longer wants to attend a Catholic School, she lost her faith in the Catholic Church and in other people.

98.     Prior to P.H.'s 2018 enrollment, Becky Hanrahan met with the Principal and the Learning Specialist to discuss P.H.'s accommodations from her Psycho-Educational Evaluation. P.H. performed well in school for the remainder of third grade, fourth grade and fifth grade.

99.     In the summer of 2021, the Principal left and a new Principal was hired for the 2021-2022 school year.

100.    In June, July and August of 2021, Peter and Becky Hanrahan obtained another evaluation of P.H. at the Washington University Child Psychiatry Clinic. The Washington University evaluation concluded that P.H. was diagnosed with Social Anxiety Disorder, confirmed her ADHD and recommended educational accommodations for her disabilities.

101.    In August of 2021 the Hanrahans provided Ste. Genevieve School with the Educational Recommendations Letter from Washington University regarding P.H., which was based on and included the results of their evaluation.

102.    In early September of 2021 the Hanrahans communicated with Ste. Genevieve School staff, including the Principal, Learning Consultant and School Counselor, regarding P.H.'s disabilities and need for accommodations. Furthermore, Peter and Becky Hanrahan continued an open channel of communication about P.H.'s disabilities and shared with the Principal, School Counselor and P.H.'s core teachers that P.H. would continue to attend appointments each Wednesday morning with a social worker at Washington University's Child Psychiatric Clinic to learn processing skills for her ADHD and Social Anxiety Disorder that can be applied in an academic setting.

103.    Starting in mid-September of 2021 the Hanrahans contacted the Ste. Genevieve School Principal and P.H.'s teacher about the school's failure to provide her with needed accommodations regarding the amount of homework, lack of information about tests, lack of support, lack of consistent and timely posting of assignments, lack of syllabi, and the negative impact all of this was having on P.H.  Becky and P.H. would complete three to five hours of homework each night and prepare for at least three tests or quizzes each week.  Despite multiple attempts from Becky and Peter Hanrahan, Ste. Genevieve School would not provide assignments in advance, modify the workload, create syllabi or meet other accommodations.  Becky Hanrahan reached out to the Principal to share P.H.'s increased stress and anxiety and sent P.H. to school with a weighted lap blanket and calming toys at the social worker's suggestion but the school made no effort to address other accommodations.

104.    On Friday, October 22, 2021, the third day of P.H. being out of school with a fever, the Principal of Ste. Genevieve School called the Hanrahans and sent them an email to inform them that P.H. was suspended from school until further notice, purportedly due to some texts she posted on a group text chain with other sixth grade students. The Principal requested

the Hanrahans to provide an "At Risk Assessment" to the school and scheduled a meeting on

Monday afternoon, October 25, 2021, "to discuss further enrollment."

105.    Additionally, the Principal communicated that the Hanrahans were required to

sign the "Serving Students with Significant Medical Conditions" form, which entitled the

Principal and any personnel to circumvent HIPAA and communicate directly with P.H.'s

physicians about medical conditions in perpetuity, not limited to the present situation.

106.    The Hanrahans agreed to provide an "At Risk Assessment" from a psychiatrist, to

serve as an intermediary to get the school answers from P.H.'s doctors, and to meet on Monday,

October 25th, but, at the advice of lawyers, they refused to sign the additional form due to the

broad access it would provide to P.H.'s medical history – both past, present and future.

107.    On information and belief, around the same time, someone from the Ste.

Genevieve School reported to the Warson Woods Police Department that P.H. was believed to

have made a direct an imminent threat on another student's life, despite P.H. being out sick with

a fever for the majority of the week of October 18th, including October 22nd. As a result, a

Warson Woods Police Officer came to the Hanrahans' home on October 22, 2021, and spoke to

P.H. and her parents.

108.    The Police Officer reported to the Hanrahans that the alleged threat was ridiculous

and P.H. did not make a threat and there was no violation of Ste. Genevieve du Bois' Violence

Policy.   The Hanrahans agreed there was no violation of the Violence Policy and became

suspicious of the intent of this accusation.

109.    P.H.'s texts on the sixth grade group text chain occurred ten days before

Halloween and were in response to another student's question.  P.H.'s texts referred to "voodoo

dolls" that she had obtained from New Orleans and their supposed powers, but did not contain any actual threats of harm to other students.

110.    Numerous texts from other students in the sixth graders' group text chain did contain explicit threats of violence, and other inappropriate content including racist and sexist comments and bullying, much of which was directed by other students toward P.H. Since Ste. Genevieve du Bois had only provided the officer with a small portion of the entire text exchange, the Hanrahan's showed the officer additional pages of the text exchange and he acknowledged there were multiple violations made by other students on the text chain.

111.    Between October 22 and 25 the Hanrahans reported those other texts to the Ste. Genevieve School Principal, including a phone call to the Principal on October 22 reporting texts from other students about guns, suicides, and masturbation, which was dismissed by the Principal who said she could only act on the information she had seen and was unable to address Peter's concerns.

112.    The Principal and Pastor of Ste. Genevieve failed to get all the facts, even when offered directly to them, prior to administering judgement and punishment on P.H.

113.    On Monday morning, October 25, 2021, the Washington University Psychiatrist who had been treating P.H. since June of 2021, evaluated P.H. "for health, safety, and risk factors" and reported "that she is, in fact, safe and appropriate to return to school given a lack of imminent threat of harming herself or others." His report aligned with the Warson Woods Officer's assessment that no threat was made and P.H. was not a threat.

114.    On Monday afternoon, October 25, 2021, the Hanrahans met with the Principal and Parish Priest of St. Genevieve du Bois Parish and School and provided the written risk assessment from the Washington University Psychiatrist. The Hanrahans attempted to defend

P.H. and to discuss with the Principal and Pastor the numerous texts in the sixth graders' group text chain that did contain explicit threats and other inappropriate content, but they refused to discuss the matter.

115.    The Pastor informed the Hanrahans that P.H. was not welcome back and that she was a threat to the community.  The Principal and Pastor ignored the professional opinions of the Warson Woods Officer and the psychiatrist and deemed P.H. a threat despite not having violated any school code.  No other student, including the ones who directly violated multiple categories of the Ste. Genevieve Violence Policy was expelled.

116.    The Hanrahans' interactions with the school and the Principal and Pastor's refusal to address true Violence Policy violations as forcefully as they addressed P.H.'s non-violation, highlighted that the reason for the suspension and ultimate expulsion was not about violations but about P.H.  Comments made about the Hanrahans following P.H.'s expulsion cited the parents' interactions with the school were the real reasons for expulsion.

117.    The Principal knew P.H. very well and had met with P.H. individually a number of times during the first months of school.  The Principal knew P.H.'s character but still did not attempt to gather the facts before assigning punishment.  The Principal and Pastor did not meet with P.H. to discuss the situation to help P.H. understand the claims against her and the situation. The Pastor never met P.H. and passed judgement without knowing who she was.

118.    Following her suspension, P.H. became emotionally upset, which escalated after her expulsion.  She hyperventilated, she cried often and the Hanrahans extended her appointments with the Social Worker beyond the treatment plan for an additional four months. P.H.'s anxiety increased and her medication had to be adjusted as a result of this emotional distress.

119.    P.H. felt betrayed by the Principal, who she thought was her friend and someone who could be trusted knowing about her struggles with Social Anxiety Disorder and ADHD, but, after the expulsion, P.H. struggles to fully comprehend how the Principal would not support P.H. in this situation and rather rush to judgement with the limited information presented on October 22nd.

120.    P.H. has become scared of being alone in situations without a parent present, she fears going to the grocery store because Ste. Genevieve families shop there, she developed high anxiety about attending the summer camp that used to excite her.  P.H. prepares talking points to defend herself in case she runs into a Ste. Genevieve classmate or family while shopping or any activity outside of the home.

121.    P.H. lost daily contact with her two best friends, which has caused her constant concern that she will lose them completely.  As a result, P.H. second guesses her peer interactions at her new school and is insecure in her friendships. P.H.'s confidence overall has diminished, she worries she is not good enough, she fears making a mistake, and she feels compelled to explain all of her actions because she worries she will be misunderstood or unintentionally get in trouble. Ste. Genevieve School's actions have exacerbated P.H.'s Social Anxiety Disorder.

122.    Following P.H.'s expulsion from Ste. Genevieve, the Hanrahans sought assistance from the Archdiocese of St. Louis. They were informed by the Archdiocese Regional Director for Elementary Education that the Priest's decision is final and there is no path for appeal.

123.    R.H. was a third grade student at Ste. Genevieve School during the 2021-22 school year.

124.     As a result of the expulsion of P.H., the Hanrahans felt compelled to remove their younger daughter R.H. from the school as well.

125.     Neither of the Hanrahans' children have returned to Ste. Genevieve or any other Catholic School after the expulsion of P.H.  Because of the actions of Ste. Genevieve, P.H. and R.H. could not continue the intended path to an all-girls Catholic school immediately after graduating from Ste. Genevieve, instead enrolling in public schools.

126.     When her older sister, P.H., was expelled from Ste. Genevieve, R.H. was in her third year at that school.  R.H. suffered significant emotional distress from what she learned about what happened to P.H.  R.H. lost contact with all of her friends immediately.  No Ste. Genevieve School family reached out with support for R.H. she was cut-off and did not fully understand the situation.

127.     R.H. witnessed P.H.'s emotional outbreaks and distress as well as the anger and emotional turmoil of her parents.  Prior to the expulsion, the Hanrahans maintained a calm home with a schedule to complete homework and study with P.H. and R.H., which helped P.H. focus and learn.

128.     Becky and Peter Hanrahan tried to mitigate the the havoc created by P.H.'s expulsion but struggled to maintain a sense of normalcy at home while they navigated the process of unexpectedly finding new schools for their children, managing their own heartbreak and confusion, and continuing to be high-performers at their jobs without contributing additional upset to P.H. and R.H.  It was three weeks before P.H. and R.H. were enrolled in new schools

129.     The Hanrahans continue to experience emotional distress. P.H. and R.H. think regularly about P.H.'s expulsion, refreshing the mental anguish.

130.     Becky Hanrahan now hesitates to advocate for P.H. with her current teachers due to her experience at Ste. Genevieve School.  While Becky does communicate with P.H.'s teachers, she no longer thinks of them as partners and worries that her advocacy as a mother of a daughter with ADHD and Social Anxiety Disorder will put P.H. at risk of being singled out by teachers or disciplined unnecessarily, as it did at Ste. Genevieve.

131.     Defendants Archdiocese of St. Louis and Ste. Genevieve du Bois Parish and School do not have any grievance procedures for the resolution of complaints regarding the education of students with disabilities.

132.     Defendants Archdiocese of St. Louis and Ste. Genevieve du Bois Parish and School do not provide notice to the parents of students in their schools that they do not discriminate on the basis of disability.

133.     Defendants Archdiocese of St. Louis and Ste. Genevieve du Bois Parish and School, aware of P.H.'s disability and Social Anxiety Disorder diagnosis and the Principal's first-hand experience working with P.H., knowingly inflicted emotional distress on P.H., a student with no prior disciplinary actions, through their abrupt and uninformed suspension and expulsion.  The impact of the expulsion of P.H. on her and the rest of her family has been emotionally devastating.  They each suffered significant emotional distress because of St. Genevieve's actions against P.H.

134.     Defendants Archdiocese of St. Louis and Ste. Genevieve du Bois Parish and School do not inform parents of students in their schools of a responsible employee designated to coordinate their compliance with Section 504.

**C.      The Discriminatory Conduct of the Archdiocese and Immaculate Conception Defendants Toward B.Y. and Its Unlawful Conduct Toward Her Mother.**

135.    B.Y. began attending Immaculate Conception School as a kindergarten student and has been continuously enrolled there since that time. During her third grade year, in the Spring of 2021, Immaculate Conception School recognized that B.Y. had an IQ of 102 but struggles in reading and written expression and that her struggles may have been caused by Anxiety.

136.    Starting at the end of the 2020-21 school year, and continuing through the 2021-22 school year, Immaculate Conception School provided some Academic Support services to B.Y., but S.C. was not satisfied with those services and expressed her dissatisfaction to the School.

137.    Immaculate Conception School never informed S.C. of any grievance procedures for the resolution of her complaints and never informed S.C. of the identity of a responsible employee designated to coordinate their compliance with Section 504.

138.    Defendants Archdiocese of St. Louis and Immaculate Conception School do not have any grievance procedures for the resolution of complaints regarding the education of students with disabilities.

139.    Defendants Archdiocese of St. Louis and Immaculate Conception School do not provide notice to the parents of students in their schools that they do not discriminate on the basis of disability.

140.    Defendants Archdiocese of St. Louis and Immaculate Conception School do not inform parents of students in their schools of a responsible employee designated to coordinate their compliance with Section 504.

**D.** **Defendants' Violations of Explicit Requirements of Section 504 Applicable to Private Schools.**

141.   As a private educational entity that offers special educational services, the Archdiocese and Lourdes are required to comply with certain requirements of Section 504 in addition to the requirement to provide reasonable accommodations. Those requirements include the following obligations:

    a.   The obligation to "conduct an evaluation … of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement," 34 C.F.R. §104.35(a);

    b.   The obligation to "establish standards and procedures for the evaluation and placement of persons who, because of handicap, need or are believed to need special education or related services";

    c.   The obligation to "establish and implement" for students with disabilities "a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

142.   Lourdes never conducted an evaluation of L.B. Nor were L.B.'s parents ever provided with procedural safeguards, including notice and an opportunity to be heard, and L.B. and her sisters were summarily expelled without notice or due process.

143.   On July 13, 2018, F.B. and M.B., through counsel, submitted a formal complaint and request for hearing to the Archdiocesan Archbishop, Robert J. Carlson; to Father Jim Theby,

the Pastor of Our Lady of Lourdes Parish; and the Principal of Our Lady of Lourdes School,

Tammi Rohman, setting forth the facts and violations of law discussed above.

144.    The only response the family received to this complaint was a statement that the

defendants are unwilling to engage with lawyers and that the decision was final and not subject

to review.

## V.    CLAIMS.

### COUNT I
### SECTION 504 OF THE REHABILITATION ACT
### U.S.C.  § 794: Archdiocese Defendants

145.    Plaintiffs repeat each paragraph above as if set forth at length herein.

146.    Acting in bad faith and with gross misjudgment and deliberate indifference, the

Archdiocese Defendants violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

      a.   denying L.B., P.H. and B.Y. the opportunity to participate in and benefit from federally assisted regular and special education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

      b.   affording L.B., P.H. and B.Y. an opportunity to participate in or benefit from education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

      c.   providing L.B., P.H. and B.Y. with an education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

      d.   limiting L.B.'s, P.H.'s and B.Y.'s enjoyment of the right and opportunity to receive an education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);

      e.   failing to establish standards and procedures for the evaluation and placement of students who, because of their disabilities, need or are believed to need special education services, in violation of 34 C.F.R. § 104.34(b);

      f.   failing to provide L.B.'s parents, P.H.'s parents and B.Y.'s mother with procedural safeguards, including prior written notice and opportunity for a hearing, in violation of 34 C.F.R. § 104.36.

147.    Acting in bad faith and with gross misjudgment and deliberate indifference, the

Archdiocese Defendants violated the rights of F.B., M.B., L.B., I.B., E.B., El.B., Peter and

Becky Hanrahan, P.H., R.H., S.C. and B.Y. secured by Section 504 of the Rehabilitation Act of

1973, as amended, 29 U.S.C. § 794 and 34 C.F.R.§ 104.4 by retaliating against them because of

a protected activity, the parents' advocacy for the accommodations their children needed.

148.    Defendants had actual notice of the above violations of plaintiffs' rights.

**COUNT II**
**SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794: Our Lady of Lourdes Parish and School**

149.    Plaintiffs repeat each paragraph above as if set forth at length herein.

150.    Acting in bad faith and with gross misjudgment and deliberate indifference, Our

Lady of Lourdes Parish and School violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4

by:

    a.   denying L.B. the opportunity to participate in and benefit from federally assisted regular and special education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    b.   affording L.B. an opportunity to participate in or benefit from education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

    c.   providing L.B. with an education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

    d.   providing L.B.. with different or separate aids, benefits, or services, although

    e.   limiting L.B.'s enjoyment of the right and opportunity to receive an education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);

    f.   failing to provide L.B.'s parents with procedural safeguards, including prior written notice and opportunity for a hearing, in violation of 34 C.F.R. § 104.36.

151.    Acting in bad faith and with gross misjudgment and deliberate indifference, the

defendant Our Lady of Lourdes Parish and School violated the rights of F.B., M.B., L.B., I.B.,

E.B. and El.B. secured by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.

§ 794 and 34 C.F.R.§ 104.4 by retaliating against them because of a protected activity, F.B. and

M.B.'s  advocacy for the accommodations L.B. needed.

152.     Defendant had actual notice of the above violations of plaintiffs' rights.

## COUNT III
## SECTION 504 OF THE REHABILITATION ACT
### 29  U.S.C.  § 794: Ste. Genevieve Du Bois Catholic Church

153.    Plaintiffs repeat each paragraph above as if set forth at length herein.

154.    Acting in bad faith and with gross misjudgment and deliberate indifference, St.

Genevieve Du Bois Catholic Church violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. §

104.4 by:

    a.   denying P.H. the opportunity to participate in and benefit from federally assisted regular and special education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    b.   affording P.H. an opportunity to participate in or benefit from education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

    c.   providing P.H. with an education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

    d.   providing P.H. with different or separate aids, benefits, or services, although

    e.   limiting P.H.'s enjoyment of the right and opportunity to receive an education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);

    f.   failing to provide P.H.'s parents with procedural safeguards, including prior written notice and opportunity for a hearing, in violation of 34 C.F.R. § 104.36.

155.    Acting in bad faith and with gross misjudgment and deliberate indifference, the

defendant Ste. Genevieve Du Bois Catholic Church violated the rights of  Peter and Becky

Hanrahan, P.H. and R.H.   secured by Section 504 of the Rehabilitation Act of 1973, as amended,

29 U.S.C. § 794 and 34 C.F.R.§ 104.4 by retaliating against them because of a protected activity,

Peter and Becky Hanrahan's advocacy for the accommodations P.H. needed.

156.    Defendant had actual notice of the above violations of plaintiffs' rights.

## COUNT IV
## SECTION 504 OF THE REHABILITATION ACT
### 29  U.S.C.  § 794: Immaculate Conception Catholic Church, Union

157.    Plaintiffs repeat each paragraph above as if set forth at length herein.

158.    Acting in bad faith and with gross misjudgment and deliberate indifference,

Immaculate Conception Catholic Church violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. §

104.4 by:

a.      denying B.Y. the opportunity to participate in and benefit from federally
        assisted regular and special education services, in violation of 29 U.S.C. §
        794(a) and 34 C.F.R. § 104.4(b)(1)(i);

b.      affording B.Y. an opportunity to participate in or benefit from an
        education that is not equal to that afforded others, in violation of 29 U.S.C.
        §  794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

c.      providing B.Y. with an education that is not as effective as that provided
        to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. §
        104.4(b)(1)(iii);

d.      providing B.Y. with different or separate aids, benefits, or services,
        although

e.      limiting B.Y's enjoyment of the right and opportunity to receive an
        education, in violation of 34 C.F.R. § 104.4(b)(1)(vii);

f.      failing to provide B.Y.'s parents with procedural safeguards, including
        prior written notice and opportunity for a hearing, in violation of 34 C.F.R.
        § 104.36.

159.    Acting in bad faith and with gross misjudgment and deliberate indifference, the

defendant Immaculate Conception Catholic Church violated the rights of  B.Y. and S.C.  secured

by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R.§

104.4 by retaliating against them because of a protected activity,  S.C's advocacy for the

accommodations B.Y. needed.

160.    Defendant had actual notice of the above violations of plaintiffs' rights.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:
## DEFENDANTS ARCHDIOCESE OF ST. LOUIS,
## LOURDES AND STE. GENEVIEVE DU BOIS

161.    By their conduct as described above, Defendants, by and through their agents and

employees who were acting within the scope and course of their employment,  intentionally or

recklessly engaged in extreme and outrageous conduct.

162.     Defendants' conduct was intended only to cause Plaintiffs, and did cause Plaintiffs, severe emotional distress.

163.     Plaintiffs suffered medically significant emotional distress as a result of Defendants' actions as set forth in this Complaint.

164.     Defendants' actions and omissions were willful, wanton and reckless for which fair and reasonable punitive damages and/or damages for aggravating circumstances are appropriate.

165.     As a result of the above described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities in obtaining a full enjoyment of life; have sustained loss of earnings and earning capacity; and Plaintiffs have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS:
### DEFENDANTS ARCHDIOCESE OF ST. LOUIS,
### LOURDES AND STE. GENEVIEVE DU BOIS

166.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

167.     By their conduct as described above, Defendants, by and through their agents and employees who were acting within the scope and course of their employment, and Defendants, individually, breached their duty to Plaintiffs by engaging in conduct that they knew or should have known involved an unreasonable risk of causing Plaintiffs severe emotional distress.

168.     Defendants' conduct did cause Plaintiffs severe emotional distress. Plaintiffs suffered medically significant and medically diagnosable emotional distress as a result of Defendants' actions as set forth in this Complaint. As a result of the above described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities in obtaining a full enjoyment of life; have sustained loss of earnings and earning capacity; and Plaintiffs have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### COUNT VII
### BREACH OF FIDUCIARY DUTY:
### DEFENDANTS ARCHDIOCESE OF ST. LOUIS,
### LOURDES AND STE. GENEVIEVE DU BOIS

169.     Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

170.     Defendants maintained a fiduciary and confidential relationship with Plaintiffs as a matter of law due to the nature of the relationship between Plaintiffs and Defendants.

171.     Defendants also had a special fiduciary and confidential relationship with Plaintiffs by virtue of their roles as religious institutions and their leaders. This relationship is one of confidence, trust and care as a matter of law.

172.     By committing the acts and omissions described herein, Defendants, including employees and agents of Defendants, acting within the course and scope of their duties, breached their fiduciary duty to Plaintiffs.

173.    Defendants' actions and omissions were willful, wanton and reckless for which fair and reasonable punitive damages and/or damages for aggravating circumstances are appropriate.

174.    As a result of the above described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life; was prevented and will continue to be prevented from performing their daily activities in obtaining a full enjoyment of life; have sustained loss of earnings and earning capacity; and Plaintiffs have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**COUNT VII**
**CONSTRUCTIVE FRAUD**
**DEFENDANTS ARCHDIOCESE OF ST. LOUIS,**
**LOURDES AND STE. GENEVIEVE DU BOIS**

175.    Defendants' position of power and authority over Plaintiffs gave rise to a special relationship between the parties that is protected by law separate and apart from any other obligations, contractual or otherwise.  Defendants deliberately invited and created a fiduciary and confidential relationship with Plaintiffs.

176.    Plaintiffs reposed trust and confidence in the Defendants for their protection, nurture, counseling and well being.

177.    As a result of Defendants' undertaking the care and guidance of Plaintiffs, Defendants entered into a relationship in which social, economic, and physical power rested exclusively in the hands of the Defendants, in which Defendants had power and mastery over the Plaintiffs.

178.    Defendants owed Plaintiffs the duty of trust and loyalty and the duty to work for her benefit, and to keep them safe.

179.    As fiduciaries to Plaintiffs, Defendants had a duty to deal with them with utmost care, avoiding even the appearance of a conflict of interest.

180.    By committing the acts and omissions described herein, Defendants, including employees and agents of Defendants. acting within the course and scope of their duties, breached their fiduciary duty to Plaintiffs. Defendants' actions constituted constructive fraud upon the Plaintiffs.

181.    Defendants' actions and omissions were willful, wanton and reckless for which fair and reasonable punitive damages and/or damages for aggravating circumstances are appropriate.

182.    As a result of the above described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life; was prevented and will continue to be prevented from performing their daily activities in obtaining a full enjoyment of life; have sustained loss of earnings and earning capacity; and Plaintiffs have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHEREFORE, F.B.,  M.B., L.B., I.B., E.B., El.B., Peter and Becky Hanrahan, P.H., R.H., S.C. and B.Y. pray this Court for the following:

A.      Enjoin any further action that violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.;

B.      Declare, adjudge and decree that Defendants violated Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.;

     C.     Declare, adjudge and decree that Defendants have retaliated against F.B., M.B., L.B., I.B. E.B. and El.B. for exercising their rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, et seq.

     D.     Make F.B., M.B., L.B., I.B., E.B., El.B, Peter and Becky Hanrahan, P.H. and R.H. whole for the damages suffered by them for defendants' willful violations and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. and Missouri state law governing intentional infliction of emotional distress, negligent infliction of emotional distress, breach of fiduciary duty and constructive fraud in an amount adequate to compensate them for their injuries.

     E.     Award plaintiffs their costs herein, including reasonable attorneys' fees;

     F.     Award plaintiffs pre-judgment and post-judgment interest; and,

     G.     Grant such additional relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial under Federal Rule of Civil Procedure 38(b).

     Respectfully submitted,

     */s/ Kenneth M. Chackes*
     Kenneth M. Chackes, #27534MO
     (Local Counsel)
     KEN CHACKES, LLC
     230 S. Bemiston Ave., Suite 510
     St. Louis, Missouri 63105
        Phone: (314) 872-
        8420 Fax: (314)
        872-7017
        kchackes@chackes.
        com

Judith A. Gran
PA Attorney ID 40134
(appearing pro hac vice)
    Reisman Carolla Gran & Zuba, LLP
19 Chestnut Street
Haddonfield, NJ 08033
    Telephone: (856)-354-
    0061 Fax: (856) 873-
    5640
    judith@rcglawoffices.c
    om

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of July, 2022, the foregoing was filed with the Clerk of Court electronically, to be served by operation of the Court's electronic filing system upon all parties of record.

 *s/Kenneth M. Chackes*